UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

THE PHOENIX COMPANIES, INC., *now
known as* THE NASSAU COMPANIES OF
NEW YORK,

                        Plaintiff,

             -v.-

CONCENTRIX INSURANCE
ADMINISTRATION SOLUTIONS
CORPORATION,

                        Defendant.

———————————————————————

CONCENTRIX INSURANCE
ADMINISTRATION SOLUTIONS
CORPORATION,

                        Counter-Claimant,

             -v.-

THE PHOENIX COMPANIES, INC., *now
known as* THE NASSAU COMPANIES OF
NEW YORK; PRICEWATERHOUSECOOPERS
ADVISORY SERVICES LLC; and ROES 1
THROUGH 10,

                        Counter-
                        Defendants.

———————————————————————

20 Civ. 1738 (KPF)

**REDACTED
OPINION AND
ORDER**

KATHERINE POLK FAILLA, District Judge:

        In 2016, Plaintiff Phoenix Companies, Inc., now known as the Nassau

Companies of New York ("Phoenix"), engaged the consulting firm

PricewaterhouseCoopers Advisory Services LLC ("PwC") to assist in selecting a

third-party administrator for a project referred to as "Project Vista." Following

a vendor selection process and due diligence period, Phoenix selected

Defendant Concentrix Insurance Administration Solutions Corporation ("CIS") to serve as its third-party administrator, and on December 23, 2016, Phoenix and CIS memorialized their agreement with the execution of a Master Services Agreement (the "MSA").

Project Vista did not proceed smoothly, and Phoenix subsequently brought the instant action against CIS for breach of contract, alleging that CIS had made false representations about the timeframe for the completion of Project Vista, and had concealed material facts about its ability to meet certain deadlines set forth in the MSA.  CIS then filed counterclaims against Phoenix, ultimately alleging breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, negligence, and fraud in the inducement.  In particular, CIS alleged that (i) Phoenix made misrepresentations to induce CIS to enter into the MSA; (ii) Phoenix later misled CIS to believe that Phoenix would not terminate its ongoing projects with CIS; and (iii) Phoenix failed to adhere to its obligations under the MSA. Separately, CIS designated as additional counter-claimants PwC and ten unnamed PWC employees (collectively, the "PwC Defendants"), and ultimately alleged negligent misrepresentation by PwC and negligence by all of the PwC Defendants.  In this regard, CIS alleged that PwC had made misrepresentations about Phoenix's products and business requirements, and had administered a flawed vendor selection process with an inadequate due diligence period.

Phoenix has moved for partial dismissal of CIS's Amended Counterclaim under Federal Rule of Civil Procedure 12(b)(6), seeking to dismiss CIS's

counterclaims for breach of the covenant of good faith and fair dealing, negligent misrepresentation, negligence, and fraud in the inducement — in other words, everything but breach of contract. PwC has also moved to dismiss both counterclaims brought against it. For the reasons that follow, the Court grants in part and denies in part Phoenix's motion, and grants in its entirety PwC's motion.

BACKGROUND[1]

## A.    Factual Background

### 1.    Project Vista and the Vendor Selection Process

The Court accepts as true for purposes of these motions the well-pleaded allegations of CIS's Amended Counterclaim. In early 2016, Phoenix engaged

---

[1]    The facts contained in this Opinion are drawn principally from CIS's Amended Answer and Counterclaim ("Amended Counterclaim" or "Am. Countercl." (Dkt. #56)). Additional facts come from the December 23, 2016 Master Services Agreement appended to the Declaration of Bryan F. Lewis in Support of Phoenix's Motion to Dismiss (the "MSA" (Dkt. #63-3)), as it is incorporated by reference in the Amended Counterclaim. "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Moreover "[w]here a document is not incorporated by reference, the court may neverless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico* v. *Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)); *see also Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A party's] *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." (emphasis in original)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)). As the Amended Counterclaim "relies heavily" on the MSA, the Court deems the MSA incorporated by reference. *See H&H Acquisition Corp.* v. *Fin. Intranet Holdings*, 669 F. Supp. 2d 351, 363 n.9 (S.D.N.Y. 2009); *see also Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (observing that in most instances where documents are considered incorporated by reference, "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls").

PwC to assist with the issuance of a Request for Information ("RFI") to potential vendors, with the objective of selecting a third-party administrator to helm a project referred to as "Project Vista." (Am. Countercl. ¶ 8).  PwC was tasked with administering the vendor selection process for Project Vista, at the conclusion of which process Phoenix would select a vendor who could transition and ultimately administer certain of Phoenix's life insurance and annuity contracts on an outsourced basis.  (*Id.*).

As part of its engagement with Phoenix, PwC managed the potential vendors' participation in a due diligence period.  (Am. Countercl. ¶ 11).  CIS, a company with experience serving as a third-party administrator in the U.S. life insurance and annuities markets, participated in the vendor selection process for Project Vista.  (*Id.* at ¶¶ 1, 11).  CIS's due diligence period began on June 12, 2016, and concluded with an oral presentation before Phoenix on August 17, 2016.  (*Id.* at ¶ 11).  CIS alleges that during the due diligence process, as potential vendors prepared proposals and responses to Phoenix's RFI, it relied upon PwC as their "primary source of information."  (*Id.* at ¶ 14).  Over 50,000 pages of documents were provided to CIS for its review during this period, including an "outline structure qualified as representative of Phoenix's

---

For ease of reference, the Court refers to the parties' briefing as follows: Phoenix's Memorandum of Law in Support of Its Partial Motion to Dismiss as "Phoenix Br." (Dkt. #72); CIS's Memorandum of Law in Opposition to Phoenix's Partial Motion to Dismiss as "CIS Phoenix Opp." (Dkt. #68); and Phoenix's Reply Brief in Further Support of Its Partial Motion to Dismiss as "Phoenix Reply" (Dkt. #73).  The Court refers to PwC's Memorandum of Law in Support of Its Motion to Dismiss as "PwC Br." (Dkt. #66); CIS's Memorandum of Law in Opposition to PwC's Motion to Dismiss as "CIS PwC Opp." (Dkt. #69); and PWC's Reply Brief in Further Support of Its Motion to Dismiss as "PwC Reply" (Dkt. #75).

products." (*Id.* at ¶¶ 16-17). While the outline lacked a warranty "that it was 100% accurate or complete," PwC representatives submitted that the outline was sufficient "to allow [CIS] to obtain an accurate estimate." (*Id.* at ¶ 17).

CIS alleges that during the due diligence period, PwC's representations about Phoenix's products and business requirements were "insufficient and inaccurate." (Am. Countercl. ¶ 22). Among other things, PwC represented that Phoenix's products were "largely standard and typical in the industry," when in fact the products were "unique and more complex than represented and more than any bidder could reasonably determine during the due diligence period, which would impact [the products'] transition to [CIS's] system, require significant modifications and impact cost and pricing for [CIS's] proposal to Phoenix[.]" (*Id.* at ¶ 18). CIS asserts that PwC made the following representations to it:

> [i] annuities containing numerous bonus features was identified as a large effort; however, after completing the detailed requirements sessions after the in-depth analysis phase after the MSA was executed, [CIS] discovered that the number of variations exceeded what was expected increasing efforts required;
>
> [ii] "Model" Index methods were represented to be a group of funds where [CIS] could leverage existing functionality of its GIAS platform but during the detailed requirement sessions after the MSA was executed, it was discovered there was linking of different riders, restrictions on money movements, and other functions that were not identified, increasing the efforts associated with the [modification];
>
> [iii] Accelerated Death Benefits was represented to be a significant [modification] however, during the detailed requirement sessions after the MSA was executed, [CIS] discovered the impacts to fund reduction order, the

> ability of the owner to select a % by policy, or the effect
> on various policy values, increased the effort associated
> with the [modification]; and
>
> [iv] the Healthy Measure Rewards COI discount
> program was explained to [CIS] to be so difficult to
> qualify that [CIS] would not have to deal with it,
> however, this turned out to be incorrect information and
> resulted in a significant [modification].

(*Id.* at ¶ 20).  CIS further alleges that PwC knew that these representations were false, and knew that CIS would rely upon them in developing its proposal for Project Vista.  (*Id.* at ¶ 19).  According to CIS, it is presently unable to identify which PwC representatives made these misrepresentations, "because the key [CIS] employees involved in the communications with PwC are no longer employed by [CIS] and have not been reachable despite diligent and reasonable efforts."  (*Id.* at ¶ 21).  CIS alleges "[b]ased upon information and belief" that the PwC representatives are known to PwC.  (*Id.*).

CIS alleges that Phoenix was also familiar with the complexities of its own products and with the modifications to its own systems over the years, but that during the due diligence period, neither Phoenix nor PwC provided samples of Phoenix's products or an explanation of the products and features. (Am. Countercl. ¶ 23).  Moreover, CIS was not allowed access to Phoenix's systems to test their compatibility with CIS's system, and was informed by PwC Manager Robert Sharp that "demos were not needed prior to signing the contract."  (*Id.* at ¶¶ 24, 26).  From this, CIS concludes:

> The vendor selection process managed by PwC was
> flawed.  PwC's process did not allow sufficient time for
> review of documents, not all documents were made
> available to [CIS], representations of the complexities of

Phoenix's products were neither highlighted nor provided, and [CIS] was not allowed to implement and run some transactions to demonstrate how [CIS's] system could work.

(*Id.* at ¶ 25).

### 2.   The August 18, 2016 Meeting and the MSA

The day after CIS made its oral presentation to Phoenix, on August 18, 2016, certain CIS employees, including CIS President Chris Caldwell, met with Phoenix's Chief Executive Officer Phil Gass and Chief Information Officer Richard Dan McCoach at a restaurant in Hartford, Connecticut. (Am. Countercl. ¶ 32). At the meeting, Gass and McCoach represented to Caldwell that Phoenix "did not know what their own policies involved," and that Phoenix thus needed the vendor in charge of Project Vista to "get the details required" and "to be flexible and deal with surprises accordingly." (*Id.* at ¶ 33). CIS alleges that it understood these statements to mean that Project Vista would include an "analysis phase" during which CIS could "analyze Phoenix's products, determine the requirements needed, and develop the modifications necessary to transition the services onto [CIS's] platform." (*Id.* at ¶ 34).

CIS was subsequently awarded the contract for Project Vista, and the parties entered into the MSA on December 23, 2016. (Am. Countercl. ¶ 37; *see also* MSA). The MSA included a "Transition Plan" that set forth schedules for the completion of ten sub-projects within Project Vista. (*See* Am. Countercl. ¶¶ 35, 41; MSA § 2.4(b) ("The Transition will be conducted in accordance with a written plan (the 'Transition Plan') .... A draft of the Transition Plan as of the Effective Date is attached to this Agreement as Schedule F.")). In negotiating

7

the MSA, CIS insisted upon language (i) characterizing the Transition Plan as a "draft," and (ii) setting forth both Phoenix's and CIS's responsibilities with respect to the joint development, approval, and implementation of the Transition Plan. (Am. Countercl. ¶ 35; *see also* MSA § 2.4(c) & (d) (setting forth Phoenix's and CIS's responsibilities)). The final draft of the Transition Plan contains the following language:

> The Transition Services are expected to have a duration of fifty (50) months from the Agreement Effective Date, based on the milestone schedule shown below. The Transition Services schedule is dependent upon the availability of [Phoenix] personnel and information. The final Transition Services plan, including the confirmed Service Commencement Dates, will be jointly developed, approved and implemented by [CIS] and [Phoenix] as a result of the analysis phase of each project.

(Am. Countercl. ¶ 40 (emphasis omitted)).

Also relevant here, the MSA included certain representations and disclaimers, including that:

> [CIS] was and is solely responsible … for due diligence conducted prior to the [MSA's] Effective Date and associated with the transition of any business, functions and services to [Phoenix], the obtaining and requesting of any additional information that is necessary to provide the Services in accordance with this Agreement … and that it has carried out or will carry out to its satisfaction, adequate due diligence exercises and verification activities on [Phoenix], any applicable Equipment, Software, Systems, and the Services so that it can properly perform the Services described[.]

(MSA § 1.6). Section 17 of the MSA included several additional pages of representations, warranties, and covenants. (*See id.* at § 17). Additionally, the MSA included a merger clause providing that "[t]his Agreement, including all

Schedules, and other documents incorporated herein, constitutes the entire understanding and agreement between the Parties with respect to the transactions contemplated herein and supersedes all other prior or contemporaneous oral or written communications, understandings or discussions with respect to the subject matter of this Agreement." (*Id.* at § 22.1).

On the topic of termination, the MSA provided that Phoenix could terminate the Agreement, or any portion of the services provided by CIS under the Agreement, "for its convenience, at any time and for any reason or no reason[.]" (MSA § 11.2(a). However, the MSA required that Phoenix provide CIS a "written notice of termination specifying the extent of the Services being terminated and the intended termination date[,]" which date "will be at least one hundred twenty (120) days after the date of such [notice]." (*Id.*). The MSA also required that, in the event of Phoenix's termination of the Agreement, it pay CIS a termination fee based upon a sliding scale set forth in a schedule to the MSA. (*Id.* at § 11.2(a) & (b)). The MSA provided that "[i]n the process of evaluating whether to undertake or allow termination, expiration or renewal of this Agreement or any SOW [Statements of Work]," Phoenix was permitted to "consider obtaining offers for performance of services similar to the Services [provided by CIS] following termination or expiration of this Agreement[.]" (*Id.* at § 12.8).

Separately, the MSA permitted Phoenix to terminate the Agreement "by delivery of a Termination Notice to [CIS]," if CIS committed a "default" under

the Agreement.  (MSA § 11.4(a)).  In the event that Phoenix terminated the Agreement due to CIS's default, it did not owe CIS any termination fee.  (*Id.*).  Appended to the MSA was a list of events that qualified as "default," which list included:

> (a)     any material breach by [CIS] of its representations, warranties or obligations under this Agreement, provided that such breach, if curable, is not cured within thirty (30) days (or such longer period as expressly set forth in this Agreement) after [Phoenix] provides [CIS] with written notice thereof; [and]

> (b)     any material breach by [CIS] of a material obligation under this Agreement that is not capable of cure[.]

(*Id.*, Schedule A at 5-6).  In contrast, CIS's ability to terminate the Agreement was limited to (i) the event of Phoenix's nonpayment or (ii) the tenth anniversary of the Agreement's Effective Date.  (*Id.* at § 11.4(b)).

Lastly for these purposes, the MSA provided that "[e]xcept for the duration of a valid Force Majeure Event or [Phoenix's] termination of this Agreement and/or any SOW pursuant to Section 11.4, each Party will continue performing its obligations under this Agreement, and [Phoenix] may not suspend the provision of Services as a result of a Disagreement or other dispute (including, without limitation, a claim of breach)[.]"  (MSA § 20.6).

### 3.     CIS's Implementation of Project Vista

Following the execution of the MSA, CIS engaged in an "in-depth analysis phase and exhaustive review" of Phoenix's products and business requirements.  (Am. Countercl. ¶ 31; *see also id.* at ¶ 51).  CIS alleges that it was only following this review — completed in or about April 2017 — that CIS

10

fully understood the complexities of Phoenix's products.  (*Id.* at ¶¶ 31, 51-52).

Moreover, at Phoenix's direction, CIS formed a relationship with an actuarial

and valuation firm, which firm similarly determined that Phoenix's products

"were not industry standard but very complex and unique."  (*Id.* at ¶ 53).

On February 15, 2017, CIS kicked off the "Vantage Project," one of the

ten projects comprising Project Vista.  (Am. Countercl. ¶ 55).  Beginning in May

2017, the Vantage Project milestones were repeatedly revised in consultation

with Phoenix.  (*Id.* at ¶¶ 58-65).  The Vantage Project was ultimately divided

into three sub-projects (referred to as Projects "A," "B," and "C").  (*Id.* at ¶ 67).

During this period, CIS retained additional personnel and vendors at its own

expense to work on Project Vista, with Phoenix's approval.  (*Id.* at ¶ 66).

In a joint meeting in June 2018, Phoenix directed CIS to put certain

workstreams "on hold," and requested a schedule for Project A.  (Am.

Countercl. ¶ 71).  Phoenix also continued to add new projects to the Vantage

Project.  (*Id.* at ¶¶ 72, 75).  Despite these enlargements of the Vantage Project,

on July 26, 2018, Phoenix informed CIS that it intended to conduct a "Request

for Proposal" (or "RFP") to identify alternate vendors for Project Vista.  (*Id.* at

¶¶ 68, 72).  CIS's Senior Vice President of Insurance Solutions requested a

copy of the RFP, but McCoach responded that he did not think it "appropriate"

to share with CIS.  (*Id.* at ¶ 73).  Pursuant to the MSA, CIS continued to invest

its time and resources into Project Vista (*id.* at ¶ 76), and in September 2018,

Phoenix approved (i) CIS's retention of certain vendors and third parties in

connection with Projects B and C, and (ii) CIS's collaboration with Phoenix team members on "alternative approaches" for certain projects (*id.* at ¶¶ 78-79).

At Phoenix's Executive Steering Committee meeting on October 30, 2018, McCoach confirmed that Phoenix was pursuing an alternate vendor for Project C through the RFP process.  (Am. Countercl. ¶ 81).  The following month, however, Phoenix's Chief Operating Officer informed CIS that he expected CIS to "keep" Projects A and B.  (*Id.* at ¶ 84).  During this period, CIS continued to present updates to Phoenix on the Project Vista timeframes and the status of the sub-projects' completion.  (*Id.* at ¶¶ 82-83, 86).  Phoenix, in turn, approved certain changes to various projects, including adding new insurance products to Project B.  (*Id.* at ¶¶ 80, 85).  Phoenix also consented to the retention of additional outside vendors to support a potential new approach for Project C, which CIS alleges misled it to believe that it would continue administering this project, despite McCoach's representations to the contrary.  (*Id.* at ¶ 87).

On January 10, 2019, CIS presented to Phoenix an overview of Projects A, B, and C.  (Am. Countercl. ¶ 89).  At the time, Project A was expected to "go-live" in April 2019, Project B in November 2019, and Project C in the first quarter of 2020.  (*Id.*).

### 4.     Phoenix's Termination of the MSA

On January 24, 2019, Phoenix advised CIS to suspend much of Project Vista, aside from a narrow workstream within Project A.  (Am. Countercl. ¶ 90). McCoach informed CIS that "the projects [were] stopped indefinitely" and that CIS should assume it would not be resuming its services under the MSA.  (*Id.*

at ¶ 91).  Phoenix did not invoke any specific provision of the MSA in instructing CIS to suspend this work.  (*Id.*).  Moreover, CIS alleges that it was not given the opportunity to cure any "defaults in performance" or to propose a plan to resume its services.  (*Id.*).

On April 1, 2019, Project A "kicked-off" its "Go Live" stage.  (Am. Countercl. ¶ 94).  On October 1, 2019, Phoenix notified CIS that it was partially terminating the MSA due to CIS's alleged delays in carrying out the Transition Plan, which delays ostensibly amounted to a "default" event under the MSA. (*Id.* at ¶¶ 95, 97).  CIS alleges that Phoenix failed to provide (i) written notice of its termination that specified the provision under which CIS had defaulted and (ii) an opportunity for CIS to cure its default, as required under the MSA.  (*Id.* at ¶ 97).

### 5.   CIS's Counterclaims

CIS asserts five counterclaims against Phoenix:

- Phoenix committed breach of contract by (i) failing to comply with its duties and obligations under the MSA, including cooperating in the implementation of the Transition Plan; (ii) jointly developing the project schedules and expanding the project's scope, knowingly and falsely representing to CIS that it agreed to Project Vista's revised schedules and inducing CIS to continue to expend its resources and time; and (iii) failing to adhere to the MSA's procedures in suspending CIS's services and terminating the Agreement ("Counterclaim One") (Am. Countercl. ¶¶ 112-24);

- Phoenix breached the implied covenant of good faith and fair dealing in (i) failing to allow CIS to attempt to cure any default; (ii) forcing CIS's ongoing performance at an increased expense without insisting that the parties reach an agreement; (iii) conducting an RFP to identify alternate vendors for Project Vista while

expanding CIS's work on Project Vista; (iv) misrepresenting its intention to keep certain projects with CIS and inducing CIS to expend its resources on those projects; and (v) wrongfully terminating portions of the MSA ("Counterclaim Two") (*id.* at ¶¶ 125-41);

- Phoenix engaged in negligent misrepresentation by misleading CIS to believe that Phoenix would not terminate CIS's role in Project Vista ("Counterclaim Three") (*id.* at ¶¶ 142-64);

- Phoenix engaged in negligent conduct in violation of its duty of care by "negligently misrepresent[ing]" and misleading CIS to believe that (i) Phoenix would work jointly with CIS in developing, approving, and implementing the Transition Plan and schedule; and (ii) despite the RFP, CIS would retain all Project Vista workstreams, which induced CIS to expend additional resources, efforts, time and expense "above and beyond what was required under the MSA" ("Counterclaim Four") (*id.* at ¶¶ 165-78); and

- Lastly, Phoenix fraudulently induced CIS to enter into the MSA by falsely leading CIS to believe that (i) Project Vista would encompass an analysis phase during which CIS could analyze Phoenix's products and develop any modifications necessary to transition the services onto CIS's platform; and (ii) Phoenix would work jointly with CIS in developing, approving and implementing the Transition Plan and schedule following the analysis phase ("Counterclaim Five") (*id.* at ¶¶ 179-95).

CIS seeks damages encompassing the applicable termination fee set forth under the MSA, in an amount no less than $**REDACTED**, as well as other substantial damages in the form of lost profits and the costs incurred by CIS in performing services under the MSA, in an amount no less than $ **REDACTED** , plus interest and attorneys' fees.  (*Id.* at ¶ 123; *id.*, Prayer for Relief ¶¶ 1-3). CIS also seeks damages arising from Phoenix's alleged fraud in the inducement, breach of the covenant of good faith and fair dealing, and

14

negligent representation.  (*Id.*, Prayer for Relief ¶¶ 4-6).  And it further seeks

rescission of the MSA in connection with its fraud in the inducement claim.

(*Id.* at ¶ 4).

>    CIS also asserts two counterclaims against the PwC Defendants:

- A negligent misrepresentation claim against PwC,
  claiming that PwC knowingly made misrepresentations
  and/or omissions of material facts regarding Phoenix's
  products and business requirements ("Counterclaim
  Six") (Am. Countercl. ¶¶ 196-213); and

- Negligence claims against both PwC and 10 of its
  unnamed employees for conducting a flawed vendor
  selection process and providing inaccurate and
  insufficient information to CIS in connection with that
  process ("Counterclaim Seven") (*id.* at ¶¶ 214-26).

CIS seeks compensatory and consequential damages from PwC.  (*Id.*, Prayer for

Relief ¶¶ 1, 6).

## B.   Procedural Background

>    Phoenix commenced the instant action with the filing of its Complaint on

February 27, 2020.  (Dkt. #1).  On April 23, 2020, CIS filed its original Answer

and Counterclaim, naming both Phoenix and PwC as counter-defendants.

(Dkt. #14).  On May 22, 2020, Phoenix submitted a pre-motion letter seeking

leave to move to dismiss CIS's Counterclaims (Dkt. #22), and CIS submitted a

letter in opposition (Dkt. #28).  The Court granted Phoenix's application and set

a briefing schedule.  (Dkt. #29).[2]  On July 8, 2020, PwC submitted a pre-

motion letter seeking leave to dismiss CIS's Counterclaim, which application

---

[2]     The briefing schedule was subsequently revised to accommodate the parties'
preparation for the accelerated deposition of a CIS witness.  (*See* Dkt. #43).

the Court granted.  (Dkt. #49, 50).  Both Phoenix and PwC submitted their opening briefs and supporting papers on July 17, 2020.  (Dkt. #51-53 (Phoenix); Dkt. #54-55 (PwC)).

On August 7, 2020, CIS filed an Amended Answer and Counterclaim. (Dkt. #56).  The Court subsequently denied Phoenix's and PwC's motions to dismiss as moot and set a briefing schedule on any updated motions to dismiss.  (Dkt. #59).  Phoenix filed a partial motion to dismiss and a supporting declaration and exhibits on September 11, 2020.  (Dkt. #62-63, 72).  PwC filed a motion to dismiss the same day.  (Dkt. #65-66).  CIS's opposing briefs were filed on October 16, 2020 (Dkt. #68 (Phoenix Opposition), 69 (PwC Opposition)), and the motions were fully briefed with the submission of Phoenix's and PwC's replies and supporting papers on October 30, 2020.  (Dkt. #73-74 (Phoenix); Dkt. #75 (PwC)).

On June 22, 2021, the Court filed an unredacted copy of this Opinion under seal.  On that same day, the Court provided the parties with a copy of the unredacted Opinion and allowed the parties to propose redactions. Pursuant to the Court's directions, the parties will file their motion papers publicly by July 19, 2021, with certain limited categories of information redacted in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  On that date, the parties will also file a joint letter suggesting redactions to the Opinion.  Taking the parties' suggestions into consideration, the Court will then file a redacted version of the Opinion on the public docket.  The Court now considers the pending motions to dismiss.

16

## DISCUSSION

### A.   Motions to Dismiss Under Rule 12(b)(6)

A court evaluates a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) using the same standard as a motion to dismiss a complaint.  *A.V.E.L.A., Inc.* v. *Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015) (internal citations omitted).  When evaluating a motion to dismiss counterclaims for failure to state a claim, a court "must accept all well-pleaded facts as true and construe the answer and counterclaims in the light most favorable to the nonmoving party."  *Meridien Int'l Bank Ltd.* v. *Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998); *see also Judd Burstein, P.C.* v. *Long*, 797 F. App'x 585, 587 (2d Cir. 2019) (summary order); *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

A counter-defendant prevails on a motion to dismiss if the claim against it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *SmartStream Techs., Inc.* v. *Chambadal*, No. 17 Civ. 2459 (VSB), 2018 WL 1870488, at *3 (S.D.N.Y. Apr. 16, 2018) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  While a court should accept the counterclaimant's allegations as true, it need not follow that course for any of the counterclaimant's legal conclusions.  *See id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Nor must a court "accept as truth conflicting pleadings ... that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of

17

which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). In sum, "[a] motion to dismiss should be granted 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Nielsen* v. *AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).

## B.   Choice of Law

New York law governs Phoenix's and CIS's contract claims pursuant to the choice of law provision of the MSA. (*See* MSA § 22.11). While under New York law a "contractual choice of law provision governs only a cause of action sounding in contract, not one sounding in tort," *Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997), all parties agree that the Court may apply New York substantive law to CIS's tort counterclaims (*see* Phoenix Br. 8-9; CIS Phoenix Opp. 4 n.1; PwC Br. 5-6; CIS PwC Opp. 4 n.1). Further, all parties agree that the Court may apply South Carolina's statute of limitations period for the purpose of determining the timeliness of CIS's counterclaims. (*See* Phoenix Br. 6-7; CIS Phoenix Opp. 17 n.2; PwC Br. 19-22; CIS PwC Opp. 15-17).[3]

CIS is incorporated in South Carolina, while Phoenix and PwC are incorporated in Delaware. (Am. Countercl. ¶¶ 1-3). Because jurisdiction in this matter is premised on diversity of citizenship (*id.* at ¶¶ 5-6), the Court applies New York choice of law rules. *See Fieger* v. *Pitney Bowes Credit Corp.*,

---

[3]   PwC argues that CIS's counterclaims are untimely under either New York's or South Carolina's statute of limitations. (PwC Br. 19-20).

251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."). "Under New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co.* v. *Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (citing *Fieger*, 251 F.3d at 393). "If not, no choice of law analysis is necessary." *Id.* Further, "[w]here the parties agree that New York law controls, this is sufficient to establish choice of law." *Id.*

The parties submit that there are no conflicts between New York and South Carolina law for these purposes, and that the Court should apply New York law. (Phoenix Br. 9; CIS Phoenix Opp. 4 n.1; PwC Br. 5-6; CIS PwC Opp. 4 n.1). Accordingly, the Court will apply New York law. *See Admiral Indem. Co.* v. *Travelers Cas. & Sur. Co. of Am.*, 881 F. Supp. 2d 570, 574 n.3 (S.D.N.Y. 2012) (observing that a court may accept the agreement of the parties as to choice of law in a diversity action and collecting cases); *accord In re Fairfield Sentry Ltd.*, 627 B.R. 546 (Bankr. S.D.N.Y. 2021).[4]

## C.     The Court Grants in Part and Denies in Part Phoenix's Motion to Dismiss

Phoenix has moved to dismiss Counterclaims Two through Five, for breach of the covenant of good faith (*see* Am. Countercl. ¶¶ 125-41); negligent misrepresentation (*id.* at ¶¶ 142-64); negligence (*id.* at ¶¶ 165-78); and fraud in

---

[4]     As discussed *infra*, given that the Court is not dismissing CIS's claims on timeliness grounds, it need not address the parties' arguments regarding the application of South Carolina's statute of limitations.

the inducement (*id.* at ¶¶ 179-95).  In relevant part, Phoenix argues that
(i) Counterclaim Two must be dismissed as duplicative of Counterclaim One
(Phoenix Br. 24-25); (ii) Counterclaims Three and Four fail to state claims upon
which relief may be granted (*id.* at 9-16); and (iii) Counterclaim Five is both
insufficiently pleaded and time-barred (*id.* at 16-23).  As detailed in the
remainder of this section, the Court accepts most, but not all, of Phoenix's
arguments for dismissal.

> **1.    The Court Grants in Part and Denies in Part Phoenix's Motion
> to Dismiss Counterclaim Two**

The Court first addresses Phoenix's argument that Counterclaim Two,
arising from its alleged breach of the implied covenant of good faith and fair
dealing, must be dismissed as duplicative of Counterclaim One, CIS's breach of
contract claim.  (Phoenix Br. 24-25).  To review, Counterclaim One alleges that
Phoenix (i) failed to comply with its duties and obligations under the MSA,
including its obligation to cooperate in the implementation of the Transition
Plan; (ii) knowingly and falsely represented to CIS that it agreed to Project
Vista's revised schedules and thereby induced CIS to continue to expend its
resources and time; and (iii) failed to adhere to the MSA's procedures in
suspending CIS's services and terminating the Agreement.  (Am. Countercl.
¶¶ 112-24).  Counterclaim Two alleges that Phoenix breached the implied
covenant of good faith and fair dealing in (i) failing to allow CIS to attempt to
cure any default; (ii) forcing CIS's ongoing performance at an increased expense
without insisting that the parties reach an agreement; (iii) conducting an RFP
to identify alternate vendors for Project Vista while expanding CIS's work on

Project Vista; (iv) misrepresenting its intention to keep certain projects with CIS and inducing CIS to expend its resources on those projects; and (iv) wrongfully terminating portions of the MSA.  (*Id.* at ¶¶ 125-41).

Phoenix argues that these claims are based on "the same operative facts," insofar as both claims arise from the termination of the MSA following CIS's investment of time and resources into Project Vista.  (Phoenix Br. 25). CIS responds that Counterclaim Two relies on "additional, different facts."  (CIS Phoenix Opp. 5).  Specifically, CIS observes, while Counterclaim One relates to "Phoenix's failure to perform its duties and obligations pursuant to the MSA, Phoenix's actions in causing project delays, and Phoenix's failure to cooperate with CIS in the implementation of the Transition Plan" (*id.* at 6-7), Counterclaim Two arises instead from "Phoenix's egregious actions in pursuing [an] RFP from other vendors, while at the same time demanding that CIS continue to incur substantial expense" (*id.* at 6).

Under New York law, a covenant of good faith and fair dealing inheres in all contracts.  *See 511 W. 232nd Owners Corp.* v. *Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Id.* (quoting *Dalton* v. *Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)).  To state a claim for breach of the covenant of good faith and fair dealing, CIS must establish that (i) Phoenix owed CIS a duty to act in good faith and conduct fair dealing; (ii) Phoenix breached that duty; and (iii) the breach of duty proximately caused CIS's

21

damages.  *See Washington* v. *Kellwood Co.*, No. 05 Civ. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009).  However, "[a] party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim."  *Deutsche Bank Sec., Inc.* v. *Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008).

As pleaded, Counterclaim Two is only partially duplicative of Counterclaim One.  While both claims encompass Phoenix's alleged failure to comply with the MSA in its suspension and termination of the Agreement (*compare* Am. Countercl. ¶¶ 119-20 (Counterclaim One), *with id.* at ¶¶ 127, 136 (Counterclaim Two)), as well as Phoenix's alleged misrepresentations regarding its intention to have CIS complete Project Vista (*compare id.* at ¶¶ 118, 120 (Counterclaim One), *with id.* at ¶¶ 134, 138 (Counterclaim Two)), CIS is correct that as pleaded, Counterclaim Two encompasses additional allegations related to Phoenix's pursuit of an RFP from an alternate vendor (*id.* at ¶¶ 128, 130-31, 134, 137).  To begin, the Court finds that to the extent the counterclaims overlap, Counterclaim Two is dismissed as duplicative.  *Cf. Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 365 (S.D.N.Y. 2012) ("[A] claim for breach of the implied covenant 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'" (quoting *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)).

22

With respect to CIS's non-duplicative allegations, which concern Phoenix's conduct in pursuing alternate vendors via the RFP process while simultaneously expanding the scope of CIS's work, Phoenix argues in its reply brief that any such participation in the RFP process was contemplated by the MSA.  (Phoenix Reply 10 (citing MSA § 12.8)).  Further, Phoenix observes that CIS, in seeking the applicable termination fee set forth under the MSA, is now endeavoring "to enforce an MSA provision designed to compensate it for this very eventuality."  (*Id.* (citing Am. Countercl. ¶ 123)).  Phoenix concludes: "The MSA quite literally contemplates this very scenario and provides CIS with a contractual remedy to recoup its outlay of expenses."  (*Id.*).

Section 12.8 of the MSA does permit Phoenix to "consider obtaining offers for performance of services similar to the Services [provided by CIS]" in "evaluating whether to undertake or allow termination … of this Agreement[.]" And while the covenant of good faith and fair dealing "incorporates any promises which a reasonable person in the position of the promisee would be justified in understanding were included," "it does not include any obligation that would be inconsistent with the express terms of the contract." *Payday Advance Plus, Inc.* v. *Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007) (internal citations and quotation marks omitted).  Significantly, however, CIS has not alleged that Phoenix's very participation in the RFP process violated any express terms of the contract.  Rather, CIS alleges that the RFP process *as carried out* by Phoenix "unfairly interfered with [CIS's] right to receive the benefits of the MSA[.]" (Am. Countercl. ¶ 134).  And CIS takes issue

23

with Phoenix's representations that despite the RFP, CIS would continue in its role under the MSA, which representations in turn induced CIS to continue to expend its time and resources on work for Project Vista.  (*See id.* at ¶¶ 132, 134-37).  On this point, CIS has alleged damages incurred in reliance on these representations, including the "increased time, resources and expenses for which it was not compensated under the MSA" and the "substantial costs incurred … with procuring outside vendors" (*see id.* at ¶ 140), which damages are distinct from those available under the MSA's termination fee and limitation-on-liability provisions (*see* MSA §§ 11.2, 13.1(a)).

The Court thus finds that there are sufficiently distinct allegations contained in a subset of Counterclaim Two to allow that subset to proceed at this stage as a separate claim.  CIS has carefully crafted its breach of contract and breach of the covenant of good faith and fair dealing claims to avoid complete overlap, and in so doing, it has succeeded in alleging two distinct claims that will survive, at least in part, the instant motion to dismiss.

### 2. The Court Dismisses Counterclaims Three and Four

The Court next turns to Phoenix's challenges to Counterclaims Three and Four, for negligent misrepresentation and negligence.  Both claims largely arise from CIS's allegations that Phoenix misled CIS to believe that it would retain all Project Vista workstreams.  (Am. Countercl. ¶¶ 143-64 (Counterclaim Three); *id.* at ¶¶ 166-78 (Counterclaim Four)).  Phoenix argues for dismissal on the bases that (i) CIS has failed to plead the necessary elements of either claim, and (ii) the claims are duplicative of both Counterclaim One and each other.

24

(Pl. Br. 9-16).  As set forth herein, the Court finds that CIS's negligence and negligent misrepresentation claims must be dismissed for failure to allege a violation of a duty independent of the MSA.

"To establish a negligence claim under New York law, a plaintiff must demonstrate that: [i] the defendant owed the plaintiff a cognizable duty of care as a matter of law; [ii] the defendant breached that duty; and [iii] plaintiff suffered damage as a proximate result of that breach." *Millennium Partners, L.P.* v. *U.S. Bank Nat'l Ass'n*, No. 12 Civ. 7581 (HB), 2013 WL 1655990, at *4 (S.D.N.Y. Apr. 17, 2013) (citing *McCarthy* v. *Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997)), *aff'd sub nom. Millennium Partners, L.P.* v. *Wells Fargo Bank, N.A.*, 654 F. App'x 507 (2d Cir. 2016) (summary order).  To state a claim for negligent misrepresentation under New York law, a plaintiff must plead "[i] the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; [ii] that the information was incorrect; and [iii] reasonable reliance on the information." *Mandarin Trading Ltd.* v. *Wildenstein*, 16 N.Y.3d 173, 180 (2011); *accord Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 479, 490 (2d Cir. 2014).

However, "[a] tort claim cannot be sustained if it 'do[es] no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached.'" *Millennium Partners*, 2013 WL 1655990, at *4 (second alteration in original) (quoting *Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at *9 (S.D.N.Y. June 25, 2004)); *see also Luxonomy Cars, Inc.* v.

*Citibank, N.A.*, 408 N.Y.S.2d 951, 954 (2d Dep't 1978).  In other words, "'a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated.'"  *Royal Park Invs. SA/NV* v. *Bank of N.Y. Mellon*, No. 14 Civ. 6502 (GHW), 2016 WL 899320, at *7 (S.D.N.Y. Mar. 2, 2016) (quoting *Bayerische Landesbank, N.Y. Branch* v. *Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012)).

Phoenix argues that CIS has failed to plead a breach of a duty independent of the MSA.  (Phoenix Br. 10-12).  In particular, it submits that when "reduced to [their] essence," CIS's allegations underlying Counterclaims Three and Four include "that Phoenix assured CIS that it was not [ ] going to terminate the MSA, but [that it] ultimately did so."  (*Id.* at 11).  CIS responds that it has alleged a breach of a duty of care that is "in part, premised upon the standard of care of the MSA," but is nonetheless "grounded in the extra-contractual duties of Phoenix to not engage in conduct that interfered with the MSA in its pursuit of a RFP and based upon the parties' relationship."  (CIS Phoenix Opp. 19-20).  In support, CIS points to the conspicuous absence of specific allegations regarding the RFP process within Counterclaim One, and argues that this "separately alleged basis for duty renders the negligence claims not duplicative with [CIS's] breach of contract claim."  (*Id.* at 20).  CIS further argues that it has adequately alleged that Phoenix had a duty "to speak and act with care" arising from the parties' contract.  (*Id.* at 20-21).

This time, CIS's artful pleading does not withstand Rule 12(b)(6) scrutiny.  CIS has not alleged a legal duty separate from Phoenix's duty to

perform under the contract.  *First*, CIS cites to no caselaw in support of a "duty of care" arising from the "extra-contractual duties of Phoenix to not engage in conduct that interfered with the MSA in its pursuit of [an] RFP and based upon the parties' relationship."  (CIS Phoenix Opp. 18-19).  And to the extent this Court understands these alleged "extra-contractual duties," it finds them to be indistinct from the parties' contractual duties under the MSA.  While CIS correctly observes that Counterclaims Three and Four, unlike Counterclaim One, include allegations of misrepresentations made by Phoenix in connection with its RFP process, these alleged misrepresentations cannot sustain a negligence claim where CIS has failed to allege that it was owed a cognizable duty of care.

*Second*, the Court finds that CIS has not established that Phoenix owed — or that it otherwise violated — any duty to speak with care.  New York courts have found that a duty to speak with care exists in the commercial context when "'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information.'"  *Kimmell* v. *Schaefer*, 89 N.Y.2d 257, 263 (1996) (alteration in *Kimmell*) (quoting *Int'l Prods. Co.* v. *Erie R.R. Co.*, 244 N.Y. 331, 338 (1927)).  Following *Kimmell*, the Second Circuit reaffirmed that liability for negligent misrepresentation may be "'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party.'"  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (quoting *Kimmell*, 89 N.Y.2d

at 263).  Courts in this District have held "routinely" that "an arms-length commercial transaction, without more, does not give rise to a special duty to speak with care."  *Henneberry* v. *Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 452 (S.D.N.Y. 2006); *see also Ixe Banco, S.A.*, v. *MBNA Am. Bank, N.A.*, No. 07 Civ. 432 (LAP), 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008) (holding that negligent misrepresentation claims will be dismissed "[w]hen the face of the complaint indicates there is only an ordinary business relationship between the parties").

When determining if a special relationship exists giving rise to a duty to provide correct information, a factual inquiry is made as to (i) whether the person making the representation held or appeared to hold unique or special expertise; (ii) whether a special relationship of trust or confidence existed between the parties; and (iii) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.  *S.E.C.* v. *Lee*, 720 F. Supp. 2d 305, 329 (S.D.N.Y. 2010) (citing *Kimmell*, 89 N.Y.2d at 264).  "[A] sparsely pled special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where the complaint emphatically alleges the other two factors[.]"  *Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004).  Since *Kimmell*, courts in this District have emphasized that the question of whether a "special relationship" giving rise to such a duty exists "should be governed by the particular relationship between the parties and is best determined on a case-by-case basis."  *Id.*; *see also JP Morgan Chase Bank* v. *Winnick*, 350 F. Supp. 2d 393,

402 (S.D.N.Y. 2004) (observing that in *Kimmell*, "the duty did not arise simply from the existence of the contract or from its terms, but rather, from the particular factual circumstances underlying the plaintiffs' decision to invest").

CIS argues that it has alleged a "special relationship of trust or confidence that existed between Phoenix … and [CIS]," and that "Phoenix's [Chief Operating Officer and Chief Information Officer] were aware and knew that [CIS] would rely upon their representations regarding the RFP and what projects would stay with [CIS][.]"  (CIS Phoenix Opp. 21 (quoting Am. Countercl. ¶ 155)).  However, alleging a "special relationship" does not make it so.  As another court in this District has recognized, the Court of Appeals itself emphasized in *Kimmell* that

> the defendant had personally sought out the individual investors, had earned a commission for inducing them to invest, and had "personally requested 'updated' projections [to give to plaintiffs], which he represented were reasonable and generated after a 'thorough discussion with our West Coast administrator,' even though they were not based on the utility rate structure in effect at the time."

*Winnick*, 350 F. Supp. 2d at 402 (quoting 89 N.Y.2d at 264-65) (alterations in *Winnick*).  Based on these factual findings, the *Kimmell* Court concluded that "the record contain[ed] an adequate basis for the finding that defendant owed a duty of care to plaintiffs[.]"  89 N.Y.2d at 265.

Here, by contrast, CIS has made no such showing.  The misrepresentations alleged by CIS include that (i) in October 2018, Phoenix's Chief Information Officer informed CIS that Phoenix was taking bids on the Project C business through the RFP (Am. Countercl. ¶ 151); (ii) in November

2018, Phoenix's Chief Operating Officer informed CIS "that it was expected" that CIS would keep Projects A and B (*id.* at ¶ 152); and (iii) during those same months, Phoenix expanded the scope of Projects A and B, consented to a potential new approach for Project C, and approved vendors and additional resources for Projects B and C (*id.* at ¶¶ 146-49, 152, 154).  To the extent any of this conduct constitutes a misrepresentation, it is more akin to a "casual informal statement or response" than a "deliberate representation" of intent to retain CIS at the conclusion of the RFP process.  *See Kimmell*, 89 N.Y.2d at 263 ("[A] 'casual response given informally does not stand on the same legal footing as a deliberate representation for purposes of determining whether an action in negligence has been established.'" (quoting *Heard* v. *City of New York*, 82 N.Y.2d 66, 74-75 (1993))).  Moreover, the Amended Counterclaim suggests that both Phoenix and CIS are sophisticated entities, and CIS does not allege that Phoenix "urged" it to rely upon the purported misrepresentations.  *See LaSalle Bank Nat'l Assoc.* v. *Citicorp Real Estate Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 1461483, at *5 (S.D.N.Y. Mar. 21, 2003) (declining to find special relationship arising from agreement involving "complex transaction between two sophisticated entities," where defendant did not allege that plaintiff "urged" defendant to rely on the misrepresentations).

Courts in this Circuit "have not hesitated to dismiss negligent misrepresentation claims on motions to dismiss" when faced with complaints that fail to "justify a finding of a special relationship of trust and confidence, above that created by the contracts involved." *Winnick*, 350 F. Supp. 2d at 403

(collecting cases).  The Court concludes that CIS has not provided any basis to find that a special relationship existed between it and Phoenix giving rise to a duty of care external to the MSA.  The Court thus dismisses Counterclaims Three and Four for failure to allege an independent duty arising in tort.[5]

### 3.    The Court Dismisses Counterclaim Five

Lastly, Phoenix moves to dismiss Counterclaim Five, alleging fraud in the inducement, on the grounds that (i) CIS has failed to allege the elements of a fraudulent inducement claim, and (ii) any such claim would be time-barred under South Carolina's statute of limitations.  (Phoenix Br. 16-25). Counterclaim Five alleges that Phoenix fraudulently induced CIS to enter into the MSA by falsely leading CIS to believe that (i) Project Vista would encompass an analysis phase during which CIS could analyze Phoenix's products and develop any modifications necessary to transition the services, and (ii) that

---

[5]    Although the Court need not reach Phoenix's other bases for dismissal, it notes that even had CIS sufficiently alleged an independent duty arising in tort, Counterclaims Three and Four would have been dismissed nonetheless for failure to allege actionable misrepresentations.  As to the former, Phoenix argued its briefing that the alleged misrepresentations that form the basis of Counterclaims Three and Four related to its "future conduct — whether it would keep projects with CIS — not to an existing material fact."  (Phoenix Br. 14).  The law in this Circuit is clear that "[p]romises of future conduct are not actionable as negligent misrepresentations."  *Campbell* v. *Thales Fund Mgmt., LLC*, No. 10 Civ. 3177 (JSR), 2010 WL 4455299, at *6 (S.D.N.Y. Oct. 12, 2010) (quoting *Murray* v. *Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987)).  CIS responds that the proffered misrepresentations concerned present facts, including "what projects were being pursued with the RFP and what projects CIS was keeping."  (CIS Phoenix Opp. 21).  However, Phoenix's alleged representations are best understood as related to its intent to maintain (or terminate) its relationship with CIS at some future time.  *See Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) (finding that "promissory representations about future events" could not support a negligent misrepresentation claim).  While CIS has striven to "frame broken promises into misrepresentations of present facts," such efforts have been found "fruitless" in the Second Circuit, and the Court reaches the same conclusion here.  *See Murray*, 811 F.2d at 124.

31

Phoenix would work jointly with CIS in developing, approving, and implementing the Transition Plan and schedule following the analysis phase. (Am. Countercl. ¶¶ 180-95).[6]  The Court agrees with Phoenix that these allegations fail to establish the necessary elements of a fraudulent inducement claim.

Fraud claims are subject to a "heightened pleading standard" under Federal Rule of Civil Procedure 9(b), *Rombach* v. *Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004), which rule specifies that a plaintiff must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  A claim predicated upon fraud must "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent."  *Rombach*, 355 F.3d at 170 (citation omitted).  Under New York law, to state a claim for fraud or fraudulent inducement, a plaintiff must demonstrate that "[i] the defendant made a material false representation; [ii] the defendant intended to defraud the plaintiff thereby; [iii] the plaintiff

---

[6]      Phoenix correctly observes that CIS's opposition brief improperly puts forth the additional allegation that "Phoenix had failed in the past with attempts to engage a third-party administrator to transition and administer services on an outsourced basis as it was seeking CIS to do[,]" in support of the argument that Phoenix "had the motive to provide CIS with false information to induce CIS to undertake [the] project and enter into the MSA[.]"  (Phoenix Reply 5 (quoting CIS Phoenix Opp. 9)).  As this allegation was not included in CIS's Amended Counterclaim, the Court will not consider it in determining the viability of Counterclaim Five.  *See Enzo Biochem, Inc.* v. *Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers."); *O'Brien* v. *Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the complaint cannot be amended by the brief in opposition to a motion to dismiss[.]").  Moreover, given the various deficiencies in Counterclaim Five discussed *infra*, any such allegations — even if properly pleaded — would be insufficient to establish a fraudulent inducement claim.

reasonably relied upon the representation; and [iv] the plaintiff suffered damage as a result of such reliance." *Wall* v. *CSX Transp. Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (citation omitted).

     **a.**    **CIS Fails to Allege a Material False Representation or an Intent to Defraud**

CIS alleges that on August 18, 2016, the day after CIS presented its proposal for Project Vista to Phoenix, certain CIS employees met with Phoenix's Chief Executive Officer Phil Gass and Chief Information Officer Richard Dan McCoach at a restaurant in Hartford, Connecticut.  (Am. Countercl. ¶ 32).  At this meeting, Gass and McCoach allegedly represented to CIS that Phoenix "did not know what their own policies involved," and that Phoenix consequently needed the vendor in charge of Project Vista to "get the details required" and "to be flexible and deal with surprises accordingly."  (*Id.* at ¶ 33).  CIS alleges that based upon these representations, CIS was "falsely led to believe it would have the analysis phase of the project to analyze Phoenix's products, determine the requirements needed, and develop the modifications necessary to transition the services onto [CIS's] platform."  (*Id.* at ¶ 182).  For this reason, CIS "insisted upon language in the MSA that the Transition Plan was a *draft*," and that the final plan would be jointly implemented following the analysis phase of each project.  (*Id.* at ¶ 183 (emphasis in original)).

Phoenix argues that its officers' statements at the August 18, 2016 meeting were not factual in nature, and in the alternative, that even if the

statements were factual, they were not materially false.  (Phoenix Br. 19-20).[7]
The Court agrees.  *First*, Phoenix's statements were "mere expressions of
opinion of present or future expectations," which statements are nearly always
insufficient to give rise to a claim for fraudulent inducement.  *See Le Metier
Beauty Inv. Partners LLC* v. *Metier Tribeca, LLC*, No. 13 Civ. 4650 (JFK), 2015
WL 769573, at *6 (S.D.N.Y. Feb. 24, 2015) (citations omitted).  Under New York
law, statements of opinion generally cannot constitute fraud, with the "narrow
exception" that such opinions "*may* constitute actionable fraud where a
present intent to deceive exists."  *Catskill Dev., L.L.C.* v. *Park Place Ent. Corp.*,
547 F.3d 115, 134 (2d Cir. 2008) (internal citations omitted).  As discussed
above, the statements made by Phoenix's officers at the August 18, 2016
meeting related to their opinions on the limitations of Phoenix's institutional

---

[7]   Phoenix puts forth the additional arguments that CIS fails to (i) specify the statements
that it contends were fraudulent, and (ii) identify the "speaker" of the statements with
particularity.  (Phoenix Br. 18).  CIS retorts that "Rule 9(b) does not require that a
complaint plead fraud with the detail of a desk calendar or a street map."  (CIS Phoenix
Opp. 8 (quoting *Int'l Motor Sports Grp., Inc.* v. *Gordon*, No. 98 Civ. 5611 (MBM), 1999 WL
619633, at *4 (S.D.N.Y. Aug. 16, 1999) (citations omitted))).  In support of its argument,
Phoenix cites *Murray Engineering P.C.* v. *Remke*, No. 17 Civ. 6267 (KPF), 2018 WL
3773991, at *14 (S.D.N.Y. Aug. 9, 2018), in which this Court found that the plaintiff
had failed to meet the heightened pleading requirement specified by Rule 9(b) where it
had not (i) identified the statements with specificity; (ii) identified the individual speaker
for each communication; and (iii) alleged where and when the statements were made.
(Phoenix Br. 18).  Here, in contrast, CIS alleges that at a meeting at a Hartford,
Connecticut restaurant on August 18, 2016, Gass and McCoach represented that
"Phoenix did not know what their own policies involved" and that Phoenix needed the
vendor in charge of Project Vista to "get the details required" and "to be flexible and deal
with surprises accordingly."  (Am. Countercl. ¶¶ 32-33).  The Court considers these
allegations to be sufficiently specific for the purposes of Rule 9(b), but for the reasons
discussed in this section, finds that CIS nonetheless fails to state a fraudulent
inducement claim under New York law.

knowledge and the desired characteristics of Project Vista's prospective vendor. They are thus not actionable in a claim for fraudulent inducement.[8]

*Second*, CIS fails to plead that Phoenix's officers possessed the requisite "intent to deceive."  *See Catskill Dev., L.L.C.*, 547 F.3d at 134.  Although CIS alleges that "[t]o obtain [CIS's] agreement to enter into the MSA, Phoenix misrepresented to [CIS] the material facts, knowing they were false when made" (Am. Countercl. ¶ 189; *see also id.* at ¶ 190 ("Phoenix made these misrepresentations and/or omission of material facts knowing that they were false when made.")), such conclusory allegations are insufficient to establish intent to deceive, as required for either (a) the exception to the principle that statements of opinion cannot constitute fraud, *see Catskill Dev., L.L.C.*, 547 F.3d at 134; or (b) the intent element of a fraudulent inducement claim, *see Wall*, 471 F.3d at 415-16.

Under Rule 9(b), CIS must allege facts "that give rise to a strong inference of fraudulent intent."  *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  This "strong inference" may be established either "(a) by alleging facts to show that [Phoenix] had both motive and opportunity to

---

[8]     Although CIS does not make such an argument in its opposition briefing, the Court recognizes that "where one party [has] superior knowledge, the expression of an opinion implies that the declarant knows facts which support that opinion and that he knows nothing which contradicts the statement.'" *Burton* v. *Iyogi, Inc.*, No. 13 Civ. 6926 (DAB), 2015 WL4385665, at *8 (S.D.N.Y. Mar. 16, 2015) (alteration in *Burton*) (quoting *Magnaleasing, Inc.* v. *Staten Island Mall*, 428 F. Supp. 1039, 1043 (S.D.N.Y. 1977), *aff'd*, 563 F.2d 567 (2d Cir. 1977)).  While CIS alleges that Phoenix's officers knew their statements were false at the time they were made, CIS fails to allege the basis for this knowledge, let alone that Phoenix's officers possessed any superior knowledge. Moreover, even had CIS made such allegations, Counterclaim Five would nonetheless be dismissed for failure to allege either the requisite intent or material false misstatements.

commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 290-91.  CIS effectively concedes that it has failed to meet this Rule 9(b) requirement in its opposition briefing, where it improperly attempts to plead additional allegations in support of its argument that Phoenix possessed motive to commit fraud. (*See* CIS Phoenix Opp. 11).  The Court will not consider these allegations on the instant motion.  *See Enzo Biochem, Inc.* v. *Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013).  CIS is left with little more than conclusory allegations that Phoenix's officers knew their statements were false when made. (*See* Am. Countercl. ¶¶ 189-90).  As these allegations are insufficient to establish either "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness," the Court finds that CIS has failed to plead fraudulent intent.

*Third*, CIS does not allege that any of the statements made at the August 18, 2016 meeting was itself materially false.  *See, e.g.*, *Mandarin Trading Ltd.*, 16 N.Y.3d at 178 (holding that plaintiff must allege a misrepresentation or a material omission of fact which was "false and known to be false").  That is, CIS alleges neither that Phoenix *did* in fact "know what their own policies involved," nor that Phoenix *did not* need the vendor in charge of Project Vista to "get the details required" and "to be flexible and deal with surprises accordingly." (*See* Am. Countercl. ¶ 33).  Rather, CIS alleges that based upon those representations, it was "falsely led to believe" that Project Vista would encompass an "analysis phase" during which CIS would "analyze

Phoenix's products, determine the requirements needed, and develop the modifications necessary." (*See id.* at ¶ 182).  Such an argument, however, is too much for these factual allegations to bear.  As Phoenix correctly observes, CIS does not allege that — at the August 18, 2016 meeting — Phoenix's officers affirmatively told CIS that it would have the opportunity to do this work following the MSA's execution.  Thus, CIS's allegations merely establish that its assumption proved inaccurate, not that Phoenix made any materially false statements.

In response, CIS argues that Phoenix's officers' statements were false because Phoenix had no intention of providing CIS with the necessary time to "get the details required" for Project Vista, despite their representations to the contrary.  (CIS Phoenix Opp. 12).  However, "'[i]t is a general rule that a claim of intentional misrepresentation cannot be predicated upon statements which are promissory in nature at the time they are made and which relate to future actions or conduct,' because '[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable.'"  *Exceed Holdings LLC* v. *Chicago Bd. Options Exch. Inc.*, No. 17 Civ. 8078 (RA), 2018 WL 4757961, at *4 (S.D.N.Y. Sept. 30, 2018) (alterations in *Exceed Holdings LLC*) (quoting *Philips Credit Corp.* v. *Regent Health Grp., Inc.*, 953 F. Supp. 482, 520 (S.D.N.Y. 1997)); *see also Perella Weinberg Partners LLC* v. *Kramer,* 58 N.Y.S.3d 384, 390 (1st Dep't 2017) ("To fulfill the element of misrepresentation of material fact, the party advancing the claim must allege a misrepresentation of present fact

rather than of future intent.").[9]  CIS's own argument reveals that its allegations

of fraudulent inducement are premised on Phoenix's lack of intent to abide by

its representations in the future.  Such allegations are insufficient to establish

materially false representations.

### b.   CIS Fails to Allege Reasonable Reliance

Counterclaim Five fails for the additional reason that CIS has not alleged

that it reasonably relied upon Phoenix's representations.

Under New York law, courts may determine "as a matter of law that a

party's reliance [is] unreasonable where the alleged misrepresentation is

explicitly contradicted by the written agreement."  *Robinson* v. *Deutsche Bank*

*Tr. Co. Americas*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008).  "When … the

contract states that a contracting party disclaims the existence of or reliance

upon specified representations, that party will not be allowed to claim that he

was defrauded into entering the contract in reliance on those representations."

*Mfrs. Hanover Tr. Co.* v. *Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993).  And "the

specificity requirement may be relaxed (or even altogether disregarded) when

---

[9]     For this reason, the Court disagrees with CIS's characterization of the First
Department's decision in *Ohm NYC LLC* v. *Times Square Assocs. LLC*, 96 N.Y.S.3d 198
(1st Dep't 2019), as instructive.  (CIS Phoenix Opp. 10-11).  There, the court deemed a
fraudulent inducement claim non-duplicative of a breach of contract claim where the
former arose from "misrepresentations of a then present fact" rather than "promises of
future performance[.]"  *Id.* at 199.  Here, Phoenix's alleged misrepresentations relate to
promises of future performance.  While CIS argues in its opposition brief that Phoenix's
officers misrepresented "present facts" that "Phoenix did not know what their own
policies involved and they needed the vendor who won the contract to get the details
required, that Phoenix did not know and could not provide" (CIS Phoenix Opp. 11
(quoting Am. Countercl. ¶ 181)), the Amended Counterclaim does not allege that those
statements were themselves inaccurate — or misrepresentations of present facts — but
merely that they had the effect of misleading CIS as to Phoenix's future expectations for
Project Vista (*see* Am. Countercl. ¶¶ 181-82).

the clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties." *PetEdge, Inc.* v. *Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017).

Phoenix argues that CIS's allegation of reliance upon representations made at the August 18, 2016 meeting is explicitly contradicted by the MSA's merger clause. (Phoenix Br. 22 (citing MSA § 22.1)). That clause states that it supersedes all prior or contemporaneous communications, understandings, or discussions with respect to the subject matter of the MSA. (*See* MSA § 22.1). Moreover, in the MSA, CIS represented that it "was and is solely responsible … for due diligence conducted prior to the [MSA's] Effective Date … and that it has carried out or will carry out to its satisfaction, adequate due diligence exercises and verification activities on [Phoenix] … so that it can properly perform the Services described," and that "there will not be any due diligence or joint verification with [Phoenix] after the applicable SOW Effective date in relation to Services under that SOW[.]" (*Id.* at § 1.6; *see also* Am. Countercl. ¶ 113 (noting that the MSA was effective as of January 1, 2017)).

Although CIS acknowledged in the MSA that it was solely responsible for due diligence and that there would not be any "due diligence or joint verification" with Phoenix after the MSA's January 1, 2017 effective date, the Court does not agree that this provision "specifically disclaims reliance" on representations about Project Vista's analysis phase. *See Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 576 (2d Cir. 2005) (per curiam) (observing that while "there need not be a precise identity between the

39

misrepresentation and the particular disclaimer ... the substance of the disclaimer provisions [must] track[] the substance of the alleged misrepresentation, notwithstanding semantical discrepancies" (internal quotation marks and citations omitted)).  That said, the Court finds that CIS has failed to establish reasonable reliance on the representations made at the August 18, 2016 meeting.

Even in the absence of a specific disclaimer, where the parties' agreement includes a merger clause, courts look to "'the entire context of the transaction' to determine whether a plaintiff's reliance on an extra-contractual representation is reasonable." *Alpha Cap. Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*, No. 17 Civ. 1235 (GHW), 2018 WL 1627266, at *13 (S.D.N.Y. Mar. 30, 2018) (quoting *Emergent Cap. Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)).  And New York courts have found that where a sophisticated party was "put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection," the party "may truly be said to have willingly assumed the business risk that the facts may not be as represented." *Lazard Freres & Co.*, 108 F.3d at 1543 (quoting *Rodas* v. *Manitaras*, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)).

The Second Circuit has not been perfectly consistent on this issue.  In one decision, the Court ascribed significance to the fact that a party could have protected itself by insisting that the alleged misrepresentations at issue be

included in the agreement.  *See FIH, LLC* v. *Found. Cap. Partners LLC*, 920 F.3d 134, 143-44 (2d Cir. 2019) (discussing *Emergent Cap.*, 343 F.3d at 195).  But even then, the Court concluded that a finding of reasonable reliance upon defendant's misrepresentations was not precluded, given the lack of factual representations in the parties' agreement, as well as "the fact that the agreement's general merger clause "contain[ed] no disclaimer of any kind of representation, and the subject matter of defendants' alleged misrepresentations was not addressed by affirmative representations in any agreement between the parties."  920 F.3d at 144.  In reaching this conclusion, the Court distinguished its prior decision in *Emergent Capital*, where it had found that a plaintiff could have "protected itself by insisting that this representation be included in the … agreement."  *Id.* at 143-44.  The Court observed that, in *Emergent Capital*, "the parties actually negotiated factual representations to be included in the written agreements that suggest a closed set of such representations upon which the plaintiff's reliance was acknowledged."  *Id.* at 144.  In contrast, in the agreement at issue in *FIH*, the negotiated terms "relate[d] to the parties' *obligations*, and [did] not constitute affirmative *factual* representations of any kind."  *Id.*

CIS is "one of the leading Third Party Administrators in the U.S. Life & Annuity market" (Am. Countercl. ¶ 1), and it agreed to numerous representations and warranties, spanning over three pages of the MSA (*see* MSA § 17).  These representations and warranties include "affirmative factual representations."  *FIH*, 920 F.3d at 144.  (*See, e.g.*, MSA § 17.1(a), (d), (g)).

Moreover, CIS alleges that, in response to the August 18, 2016 meeting, it "insisted upon language in the MSA that the Transition Plan was a *draft*," and that "the final Transition Services plan and schedule … would be jointly developed, approved and implemented by Phoenix and [CIS] as a result of the analysis phase of each project." (Am. Countercl. ¶ 183). This amply demonstrates that CIS was fully capable of protecting itself from any misrepresentations made in the August 18, 2016 meeting, and indeed, that it endeavored to do so. *See Lazard Freres & Co.*, 108 F.3d at 1543 (concluding that a "substantial and sophisticated player['s]" failure to protect itself from misrepresentation by "insisting on an examination" of the relevant documentation rendered its reliance on the misrepresentation "unreasonable").

CIS acknowledges as much in its opposition brief, noting that it negotiated the Termination Plan language, and pointing to language in the MSA stipulating that each of the ten projects under Project Vista would encompass an analysis phase. (CIS Phoenix Opp. 13-14). But in contradistinction to other of its arguments in opposition, CIS here leans into its sophistication, arguing that its reliance on the Phoenix officers' alleged misrepresentations was, on the facts alleged, "reasonable as a matter of law." (*Id.* at 13 (citing *Lazard Freres & Co.*, 108 F.3d at 1543)). Not so. Rather, the existence of these terms demonstrates that CIS's reliance was not based on any extra-contractual representations, but on the language of the MSA itself. *See Clifton* v. *Vista Computer Servs., LLC*, No. 01 Civ. 10206 (JSM), 2002 WL 1585550, at *4 (S.D.N.Y. July 16, 2002) ("When a promise is not extraneous to the terms of the

42

contract, a plaintiff with this level of business sophistication cannot make out a claim that he reasonably relied on those promises.").

In sum, CIS has failed to meet the pleading requirements for a fraudulent inducement claim.  The Court accordingly dismisses Counterclaim Five.[10]

---

[10]     Phoenix puts forth the additional arguments that: (i) CIS's fraudulent inducement claim fails to allege a breach of a duty extraneous to the parties' contract (Phoenix Br. 23), and (ii) the fraudulent inducement claim is time-barred (*id.* at 23-24).  As to the first argument, Phoenix submits that its alleged misrepresentations — regarding its knowledge of the insurance policies to be transitioned and its expectations for its vendor — related directly to the subject matter of the parties' anticipated contractual relationship, and thus did not implicate a separate legal duty.  (*Id.* at 23).  CIS responds that Phoenix had an independent legal duty prior to the execution of the MSA to provide accurate information and factual representations, and that its misrepresentations served to breach this duty.  (CIS Phoenix Opp. 9-10)).  Although CIS cites to no caselaw in support of its theory that Phoenix was under any such duty, the Court recognizes that a separate duty to disclose material facts "'may arise … where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'"  *Wild Bunch, SA* v. *Vendian Ent., LLC*, 256 F. Supp. 3d 497, 503 (S.D.N.Y. 2017) (quoting *Aaron Ferer & Sons Ltd.* v. *Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)).  Earlier in this Opinion, the Court found that CIS was unable to meet a similar standard when determining the extent of any extra-contractual duty owed *post*-MSA.  *See* Discussion Sec. C.2.  The Court need not determine whether CIS's allegations are sufficient to support the existence of a duty to disclose *prior* to the MSA's execution, given the other defects in its allegations detailed above.

Separately, Phoenix argues that Counterclaim Five is time-barred under South Carolina's "discovery rule," pursuant to which a claim for fraud accrues upon "discovery of the fraud itself or of 'such facts as would have led to the knowledge thereof, if pursued with reasonable diligence.'"  (Phoenix Br. 23-24).  *See Burgess* v. *Am. Cancer Soc., S.C. Div., Inc.*, 300 S.C. 182, 185 (1989) (quoting *Grayson* v. *Fidelity Life Ins. Co. of Philadelphia*, 114 S.C. 130, 135 (1920)).  Under Phoenix's interpretation of this rule's application, Counterclaim Five accrued in December 2016, at the time CIS entered into the MSA, and accepted that there would "not be any due diligence or joint verification" with Phoenix after the MSA's January 1, 2017 effective date.  (*Id.* at 24).  CIS does not dispute that South Carolina's discovery rule applies (CIS Phoenix Opp. 17 n.2), but argues that the statute of limitations did not begin to run until April 2017 at the earliest, after CIS engaged in the in-depth analysis phase and "discovered the true complexities of Phoenix's products (*id.* at 18).  The Court need not resolve this dispute as to timeliness, given that Phoenix has failed to state a claim for fraudulent inducement.

**D.     The Court Grants PwC's Motion to Dismiss**

For its part, PwC moves to dismiss Counterclaims Six and Seven, for negligent misrepresentation (*see* Am. Countercl. ¶¶ 196-213) and negligence (*id.* at ¶¶ 214-26).  As the Court has addressed substantively identical arguments in the context of resolving Phoenix's motion to dismiss, its discussion of the relevant legal principles in granting PwC's motion is correspondingly shorter.

**1.      The Court Dismisses Counterclaim Six**

As summarized above, Counterclaim Six alleges that PwC engaged in negligent representation by knowingly making misrepresentations and/or omissions of material facts regarding Phoenix's products and business requirements during Project Vista's vendor selection process.  (Am. Countercl. ¶¶ 197-213).  PwC argues, *inter alia*, that CIS has failed to (i) meet the requirements of Rule 9(b), and (ii) plausibly allege the elements of a negligent misrepresentation claim.  (PwC Br. 7-17).

**a.      CIS Fails to Meet the Requirements of Rule 9(b)**

At the outset, the Court addresses the parties' disagreement as to whether Counterclaim Six is subject to Rule 9(b)'s heightened pleading requirement or to the more relaxed standard of Rule 8(a).  (*See* CIS PwC Opp. 5-6; PwC Reply 1-3).  As noted above, Rule 9(b) requires that a claim predicated upon fraud "[i] specify the statements that the plaintiff contends were fraudulent; [ii] identify the speaker; [iii] state where and when the statements were made; and [iv] explain why the statements were fraudulent."

*Rombach*, 355 F.3d at 170 (citation omitted).  While many district courts in this Circuit have recognized that "the Second Circuit has not spoken clearly" to the question of whether Rule 9(b) applies to negligent misrepresentation claims, *Silvercreek Mgmt, Inc.* v. *Citigroup, Inc.*, 248 F. Supp. 3d 428, 452-53 (S.D.N.Y. 2017), "[m]ost" of these courts "have opted to apply Rule 9(b) to the negligent misrepresentation claims in front of them," *Riker* v. *Premier Cap., LLC*, No. 15 Civ. 8293 (ALC), 2016 WL 5334980, at *5 (S.D.N.Y. Sept. 22, 2016).  PwC champions this position, and refers the Court to *Aetna Casualty & Surety Co.* v. *Aniero Concrete Co.*, 404 F.3d at 583-84, a per curiam decision that numerous courts have cited in finding that claims of negligent misrepresentation must meet the Rule 9(b) standard.  *See, e.g.*, *HSM Holdings, LLC* v. *Mantu I.M. Mobile Ltd.*, No. 20 Civ. 967 (LJL), 2021 WL 918556, at *19 (S.D.N.Y. Mar. 10, 2021) (collecting cases).

Other courts have applied Rule 9(b) only where "'the negligent misrepresentation claim is based on the same set of facts as those upon which a fraud claim is grounded.'"  *Silvercreek Mgmt, Inc.*, 248 F. Supp. 3d at 453 (quoting *Eaves* v. *Designs for Fin., Inc.,* 785 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2011)).  In *Silvercreek*, the court proceeded to adopt this same "case-by-case approach," "looking at whether a plaintiff's claim 'rel[ies] on a showing of fraud or mistake[.]'"  *Id.* (alteration in *Silvercreek*) (quoting *Amos* v. *Biogen Idec Inc.*, 28 F. Supp. 3d 164, 171-72 (W.D.N.Y. 2014)).  More recently, in *Pilkington N. Am., Inc.* v. *Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 142 (S.D.N.Y. 2019), the district court undertook a similar analysis and concluded that a

plaintiff's "negligent misrepresentation claim must satisfy the heightened pleading requirements of Rule 9(b)" where (i) "the gravamen of the claim very closely sounds in fraud — at the very least it sounds in mistake[,]" and (ii) the "negligent misrepresentation claim is not sufficiently distinct from its intentional misrepresentation claim."

Here, CIS alleges that PwC represented that Phoenix's products were largely standard and typical "knowing that this was false" and "that [CIS] would reasonably rely on this information." (Am. Countercl. ¶¶ 200-01; *see also id.* at ¶ 221 ("PwC knew or should have known that [its conduct was] likely to mislead [CIS] in responding to the RFI[.]")). Given that CIS alleges that PwC engaged in "knowing deception," the Court finds that that its negligent misrepresentation claim sounds in fraud. *See HSM Holdings, LLC*, 2021 WL 918556, at *20 (collecting cases concluding that a negligent misrepresentation claim sounded in fraud where the complaint alleged knowing and intentional conduct). As such, Counterclaim Six must accord with Rule 9(b)'s pleading requirements.

CIS alleges that PwC "made statements of fact to [CIS] that Phoenix's products were largely standard and typical in the industry" (Am. Countercl. ¶ 200), and lists four specific misrepresentations allegedly made by PwC (*id.* at ¶ 20). However, CIS fails to identify any of the individuals who made these statements, or where and when the statements were made.[11]  Accordingly, CIS

---

11      In its Amended Counterclaim, CIS identifies a single PwC employee who, "in December 2016," allegedly "informed [CIS] that demos were not needed prior to signing the [MSA]."

has failed to meet the heightened pleading requirement specified by Rule 9(b). *See Murray Eng'g P.C.* v. *Remke*, No. 17 Civ. 6267 (KPF), 2018 WL 3773991, at *14 (S.D.N.Y. Aug. 9, 2018).[12]

CIS cites an exception to Rule 9(b) that allows allegations "based on information and belief" where facts are "peculiarly within the opposing party's knowledge." *Wexner* v. *First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). Where such allegations are permitted, however, "a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Id.* CIS views details of PwC's alleged misrepresentations as "peculiarly" within PwC's knowledge because the key employees involved in CIS's communications with PwC are no longer employed by CIS and "have not been reachable despite diligent and reasonable efforts." (CIS PwC Opp. 7 (citing Am. Countercl. ¶ 207)). PwC retorts that the relevant facts are *not* peculiarly within its knowledge, and that CIS has failed to submit any allegations to the contrary. (PwC Reply 3-4). Alternatively, PwC argues that even were the facts peculiarly within its possession, CIS would still "bear[] the burden of alleging facts upon which [its] belief is founded." (*Id.* at 3 (quoting *Pilkington N. Am., Inc.*, 420 F. Supp. 3d at 142)).

---

(Am. Countercl. ¶¶ 26, 220). But CIS does not characterize that statement as a misrepresentation that would support its negligent misrepresentation claim against PwC.

[12]   CIS also alleges that PwC denied its requests for additional information during the due diligence period (*see* Am. Countercl. ¶ 208), but these allegations cannot sustain a negligent misrepresentation claim. *See Harsco Corp.* v. *Segui*, 91 F.3d 337, 347-48 (2d Cir. 1996) (holding denial of a request for additional documents prior to entering into a contract does not support a negligent misrepresentation claim "unless that denial suggested falsely and deceitfully that those documents did not exist").

The Court agrees that this exception is inapplicable, as CIS has failed to set forth the factual basis for the allegations that PwC employees made either a series of specific misrepresentations (Am. Countercl. ¶ 20), or more general misstatements that Phoenix's products were largely standard and typical in the industry (*id.* at ¶ 18).  The Court is not persuaded that the mere fact that CIS has been unable to reach the former CIS employees involved in the communications at issue necessarily means that the identities of the PwC employees are "uniquely within [PwC's] knowledge and control."  *U.S. ex rel. Chorches for Bankr. Estate of Fabula* v. *Am. Med. Response, Inc.*, 865 F.3d 71, 82 (2d Cir. 2017) ("*Chorches*").  As PwC observes in its reply, CIS has not provided any explanation as to why it has been unable to identify any information about the circumstances in which the misrepresentations were made.  (*See* PwC Reply 3-4).  Given the detail CIS has provided on the content of the specific misrepresentations allegedly made by PwC representatives, the Court would expect it to possess at least some information on the identities of those who voiced the misstatements, the statements' timing and mode of transmission, and the CIS recipients.  *Cf. Chorches*, 865 F.3d at 82 (finding that billing information was peculiarly within defendant's knowledge where plaintiff alleged that they were prohibited from participating in the underlying billing procedures or accessing the relevant billing records).

CIS's allegations are insufficient for the additional reason that CIS has failed to demonstrate that PwC knew or should have known that its alleged misrepresentations were incorrect.  CIS argues that "scienter" is not a required

element of a negligent misrepresentation claim.  (CIS PwC Opp. 5).  However, Rule 9(b) requires that CIS "specifically plead facts that 'give rise to a strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'"  *Henneberry* v. *Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 542 (S.D.N.Y. 2007) (quoting *Conn. Nat'l Bank* v. *Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).  And as discussed earlier, this "strong inference" may be established either "(a) by alleging facts to show that [PwC] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner*, 459 F.3d at 290-91.

As to the first, CIS has alleged no facts demonstrating that PwC had any motive to commit fraud.  "[A]llegations of motive are sufficient if they 'entail concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.'"  *Marcus* v. *Frome*, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).  "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.  CIS has not alleged "concrete benefits" attained by PwC through its alleged misrepresentations, nor has it put forth "strong circumstantial evidence" of conscious misbehavior or recklessness.   In fact, the Amended Counterclaim is devoid of allegations indicating that PwC had any preference as to which of the vendor applicants was ultimately

49

selected to administer Project Vista, so long as such selection was made.  And while CIS alleges that PwC "possessed unique or specialized expertise of Phoenix's products and business requirements as Phoenix's agent" (Am. Countercl. ¶ 206), CIS simultaneously observes that "material facts about Phoenix's products and business requirements" "were known or only accessible to Phoenix" (*id.* at ¶ 50).  This latter allegation undermines any claim that PwC could have knowingly misrepresented or omitted material information, and CIS is left with only conclusory and speculative allegations that PwC acted knowingly.  Such allegations do not give rise to a strong inference of fraudulent intent.  *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[C]onclusory allegations [] that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things [] do not satisfy the requirements of Rule 9(b).")

For these reasons, Counterclaim Six fails to meet the pleading requirements of Rule 9(b), and the Court will dismiss it.

### b.    CIS Fails to Allege a Cognizable Duty

Counterclaim Six fails for the additional reason that CIS has not pleaded that PwC owed CIS a cognizable duty.  PwC argues that CIS has failed to allege a "special relationship" or a privity-like relationship with PwC, as required to plead a negligent misrepresentation claim.  (PwC Br. 16-17).  In response, CIS argues that PwC's relationship with Project Vista's vendors, including CIS, was "so close as to approach that of privity."  (CIS PwC Opp. 8).  As support, CIS points to allegations that PwC: (i) "managed the vendor selection process for

50

Phoenix and the due diligence period" (Am. Countercl. ¶ 11); (ii) was the "primary source of information that the vendors, including [CIS], would rely upon in responding to Phoenix's RFI process" (*id.* at ¶ 14); and (iii) had "direct communications" with CIS during the due diligence period "regarding Phoenix's products and business requirements" (*id.* at ¶ 12).

As stated earlier, to establish a negligent misrepresentation claim under New York law, CIS must plead, *inter alia*, "the existence of a special or privity-like relationship imposing a duty on [PwC] to impart correct information to [CIS.]" *Mandarin Trading Ltd.*, 16 N.Y.3d at 180.  When determining if a special relationship exists, a factual inquiry is made as to (i) whether the person making the representation held or appeared to hold unique or special expertise; (ii) whether a special relationship of trust or confidence existed between the parties; and (iii) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.  *Lee*, 720 F. Supp. 2d at 329 (citing *Kimmell*, 89 N.Y.2d at 264).

New York courts "generally do not permit negligent misrepresentation claims based on arm's-length transactions between sophisticated counterparties." *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011).  Although CIS and PwC were not engaged directly in an arm's-length transaction, PwC's interactions with CIS were, in its capacity as the administrator of Phoenix's vendor selection process. (*See* Am. Countercl. ¶ 8).  Moreover, CIS's allegations indicate that it possessed expertise as "one of the leading Third Party Administrators in the U.S. Life &

Annuity market." (*Id.* at ¶ 1). In contrast, CIS does not allege that PwC possessed "a particular background in the subject of the alleged misrepresentation." *Winnick*, 350 F. Supp. 2d at 400; *see also B & M Linen, Corp.* v. *Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (finding failure to plead reliance where plaintiff did not allege that it was "'wholly without knowledge' and wanted assurances from a defendant 'with exclusive knowledge.'" (quoting *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 189)); *Landesbank Baden-Wurttemberg*, 821 F. Supp. 2d at 624 ("[A] plaintiff cannot claim it relied on the defendant's special expertise where it is clear that the plaintiff itself had the relevant expertise at issue" (alterations and citation omitted)). And while CIS alleges that PwC knowingly made certain misrepresentations with the expectation that CIS would rely upon them (*see* Am. Countercl. ¶¶ 200-01), it also alleges that PwC facilitated the production of over 50,000 pages of documents during the due diligence period (*see id.* at ¶ 16). The latter allegation undermines any argument that PwC expected CIS to rely upon its statements over the relevant documentation. For these reasons, CIS has failed to allege that it was in a "special relationship" with PwC, such that PwC owed it a duty to provide correct information.

### c. CIS Fails to Plead Reasonable Reliance

Lastly, Counterclaim Six fails to allege reasonable reliance. CIS alleges that it relied on PwC's misrepresentations regarding Phoenix's products and business requirements in developing its proposal for Project Vista and in performing due diligence both prior to and after the execution of the MSA.

(Am. Countercl. ¶¶ 199, 201, 205).  As stated above, to establish a claim for negligent misrepresentation under New York law, a party must plead that they reasonably relied on the incorrect information given.  *Mandarin Trading Ltd.*, 16 N.Y.3d at 180.  PwC argues that (i) it was unreasonable for CIS, as a sophisticated party, to rely on any extra-contractual representations by PwC, and (ii) CIS expressly disclaimed reliance on representations related to due diligence in the MSA.  (PwC Br. 15-20)  CIS responds that (i) it was reasonable for it to rely upon PwC's representations given that the parties were in a "special relationship of trust or confidence," and (ii) the MSA does not disclaim reliance on PwC's extra-contractual representations.  (CIS PwC Opp. 10-13).

The Court agrees that CIS has failed to establish reasonable reliance for many of the same reasons discussed in connection with Counterclaim Five.  As stated above, CIS is a sophisticated party that agreed to numerous representations and warranties in the MSA.  (*See* MSA § 17).  At the time CIS entered into the MSA, it was informed that Phoenix "did not know what their own policies involved" and that Phoenix needed the vendor in charge of Project Vista to "get the details required."  (Am. Countercl. ¶ 33).  Accordingly, CIS negotiated language to ensure that the final Transition Schedule would allow it time to engage in an analysis phase for each project.  (*See id.* at ¶ 183).[13] Moreover, while CIS did not specifically disclaim reliance on representations

---

[13]    The Court views with skepticism CIS's allegation that it relied upon PwC's misrepresentations in performing due diligence after the execution of the MSA (*see* Am. Countercl. ¶ 205), given that at that juncture it had been made aware that Phoenix itself was unfamiliar with its own policies (*id.* at ¶ 33).

made by PwC, it did acknowledge that it was "solely responsible … for due diligence conducted prior to the [MSA's] Effective Date[.]" (MSA § 1.6). Consistent with its analysis as to Counterclaim Five, the Court continues to find that CIS "assumed the business risk that the facts may not be as represented." *Lazard Freres & Co.*, 108 F.3d at 1543 (quoting *Rodas*, 552 N.Y.S.2d at 620).[14]

While CIS argues that it did not disclaim any reliance on *PwC's* representations, courts in this Circuit have found that disclaimers of reliance will preclude claims against both contract signatories and their agents or third parties. *See Wells Fargo Bank Nw., N.A.* v. *Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 370 (S.D.N.Y. 2002) (deeming it "irrelevant" that defendant's agent was not a signatory to the underlying contract); *cf. Gen. Motors* v. *Villa Marin Chevrolet*, No. 98 Civ. 5206 (JG), 2000 WL 271965, at *31-32 (E.D.N.Y. Mar. 7, 2000) (concluding that it was unreasonable for a party to claim fraudulent inducement on the basis of a third party's prior representation where reliance was specifically disclaimed in the agreement). CIS cites to no legal authority indicating that PwC's position as Phoenix's third party or agent

---

[14]    The Court finds CIS's citation to *Robinson* v. *Deutsche Trust Co. Am.*, 572 F. Supp. 2d 319, 322-24 (S.D.N.Y. 2008), unpersuasive, as there the district court found that the representation at issue was "more remote from the matters set forth in the Agreement." Moreover, the *Robinson* court distinguished its case from *Emergent Capital Investment Management, LLC* v. *Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003), in which case the Second Circuit had concluded that plaintiff's reliance on extra-contractual representations was not reasonable where the contract included "extensive contractual representation about other matters." *Robinson*, 572 F. Supp. 2d at 324 (quoting *Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 193)). As in *Emergent Capital*, here the MSA included "extensive contractual representations," suggesting "a closed set of such representations upon which [CIS's] reliance was acknowledged." *See FIH, LLC* v. *Found. Cap. Partners LLC*, 920 F.3d 134, 144 (2d Cir. 2019) (discussing *Emergent Capital*).

54

should impact the Court's analysis of the reliance prong, and the Court is aware of no such case law.  As CIS has failed to plead reasonable reliance, the Court must dismiss Counterclaim Six for this additional reason.

### 2.    The Court Dismisses Counterclaim Seven as to PwC

The Court now turns to Counterclaim Seven, in which CIS alleges in relevant part that PwC acted negligently in connection with the vendor selection process.  PwC argues that Counterclaim Seven should be dismissed as duplicative of Counterclaim Six.  (PwC Br. 18-19).  CIS responds that its negligence claim is both an alternative *and* a distinct theory of recovery.  (CIS PwC Opp. 14-15).  Again, the Court finds that PwC has the better of the arguments.

Duplicative claims are dismissed when they are based on identical conduct and seek the same relief.  *See Paladini* v. *Capossela, Cohen, LLC*, No. 11 Civ. 2252 (LAP), 2012 WL 3834655, at *6 (S.D.N.Y. Aug. 15, 2012) (dismissing negligence, negligent misrepresentation, and other claims as duplicative where they stated the same injuries and sought identical relief), *aff'd*, 515 F. App'x 63 (2d Cir. 2013) (summary order).  CIS argues that it should be permitted to pursue an alternative theory of negligence pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, which rule provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d)(2).  In support, CIS refers the Court to

other cases in which district courts have refrained from dismissing alternative theories of unjust enrichment, *see Seiden Assocs., Inc.* v. *ANC Holdings, Inc.*, 754 F. Supp. 37, 40 (S.D.N.Y. 1991); *St. John's Univ., N.Y.* v. *Bolton*, 757 F. Supp. 2d 144, 183-84 (E.D.N.Y. 2010), as well as a Second Circuit decision observing that at times parties may need to raise multiple *inconsistent* claims, *Henry* v. *Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994).  None of these decisions provides guidance as to the treatment of *duplicative* claims.

Though CIS asserts that its negligence claim is "distinct" from its negligent misrepresentation claim, it does not identify any such distinctions in its opposition brief.  (CIS PwC Opp. 14-15).  The claims as alleged may not be identical word-for-word, but they are identical in substance.  Both claims allege that (i) PwC owed a duty to provide accurate information about Phoenix's products and business requirements to vendors during the vendor selection process (*see* Am. Countercl. ¶¶ 198-99, 211 (Counterclaim Six); *id.* at ¶¶ 215, 217 (Counterclaim Seven));[15] (ii) PwC knowingly either provided CIS with inaccurate information or omitted material information regarding Phoenix's products and business requirements (*see id.* at ¶¶ 200, 202-03 (Counterclaim

---

[15]    Relatedly, PwC argues that Counterclaim Seven should be dismissed for the same reason as Counterclaim Six — that CIS has failed to plead that PwC owed CIS a cognizable duty.  (PwC Br. 19).  As discussed above in connection with Counterclaim Six, CIS failed to allege that PwC owed it a duty to impart correct information.  Given that CIS alleges the same duty of care in support of both its negligent misrepresentation and negligence claims, the Court's finding that CIS's allegations were insufficient in connection with its negligent misrepresentation claim may separately provide a sufficient basis for the dismissal of its negligence claim.  *Cf. Pasternack* v. *Lab'y Corp. of Am.*, No. 10 Civ. 4426 (PGG), 2014 WL 4832299, at *13-14 (S.D.N.Y. Sept. 29, 2014) (dismissing negligence and negligent misrepresentation claims where plaintiff failed to allege a basis for any duty owed to him by defendant) (collecting cases).

Six); *id.* at ¶¶ 221-22 (Counterclaim Seven)); (iii) PwC administered a flawed

vendor selection process that did not allow CIS sufficient time to conduct due

diligence (*id.* at ¶¶ 208, 210 (Counterclaim Six); *id.* at ¶¶ 219-20 (Counterclaim

Seven)); and (iv) PwC refused CIS's requests for information (*id.* at ¶ 208

(Counterclaim Six)) and did not permit CIS to conduct demonstrations on

Phoenix's products (*id.* at ¶¶ 219-20 (Counterclaim Seven)).  The Court

accordingly dismisses Counterclaim Seven as duplicative of Counterclaim Six.

*See Meeker* v. *McLaughlin,* No. 17 Civ. 5673 (SN), 2018 WL 3410014, at *10 n.4

(S.D.N.Y. July 13, 2018) (dismissing negligence and gross negligence claims as

duplicative of negligent misrepresentation claim); *Sands Harbor Marina Corp.* v.

*Wells Fargo Ins. Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 362-63 (E.D.N.Y.

2016) (dismissing negligence claim as "nearly identical" to negligent

misrepresentation claim and collecting cases holding the same); *cf. Hughes* v.

*BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 303 n.16 (S.D.N.Y. 2006)

("collaps[ing]" plaintiffs' negligence claim into their negligent misrepresentation

and non-disclosure claims where "the factual allegations underlying plaintiffs'

claim for 'negligence' center on defendants' alleged misrepresentations and

failure to disclose material facts").[16]

E.    **The Court Denies Leave to Amend**

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a

court 'should freely give leave [to amend] when justice so requires.'"  *Gorman* v.

---

[16]    Because the Court dismisses Counterclaims Six and Seven on other grounds, it need not address PwC's arguments regarding timeliness or improper joinder.  (*See* PwC Br. 19-25).

*Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)).  Consistent with this liberal amendment policy, "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'"  *Id.* (alteration in *Gorman*) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  That being said, "it remains 'proper to deny leave to replead where ... amendment would be futile.'"  *Id.* (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).

        CIS has previously amended its counterclaims with the benefit of pre-motion letters and opening briefs from both Phoenix and PwC (*see* Dkt. #22, 49, 51-53, 54-54), but has continued to put forth a number of claims that cannot survive a Rule 12(b)(6) motion to dismiss.  Accordingly, the Court finds that leave to amend would be futile.  *Cf. Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration, footnote, and internal quotation marks omitted)); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y.

58

Aug. 6, 2020).  The Court's partial dismissal of the claims discussed above is with prejudice.

## CONCLUSION

For the reasons set forth in this Opinion, Phoenix's motion to dismiss is GRANTED in part and DENIED in part, and PwC's motion to dismiss is GRANTED.  The Court dismisses Counterclaim Two to the extent it is duplicative of Counterclaim One, and dismisses Counterclaims Three, Four, Five, and Six.  The Court also dismisses Counterclaim Seven as to PwC.  The Clerk of Court is directed to terminate the motions at docket entries 62 and 65.

The parties are directed to submit a joint letter and Proposed Case Management Plan and Scheduling Order on or before **July 19, 2021**.  On or before that same date, CIS is ORDERED to show cause why the case should not be dismissed as to the Roe Defendants, who have been neither identified nor served since the original Answer and Counterclaim was filed in April 2020.

This Opinion is being filed under seal, viewable to the Court and the parties only.  The parties' redacted motion papers are to be filed on or before **July 19, 2021**; that same day, the parties will jointly propose redactions to this Opinion.

SO ORDERED.

Dated:      June 22, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

59